Application of William CARLS.
Patent Appeal No. 7092.

United States Court of Customs
and Patent Appeals.
Feb. 13, 1964.

Barnes, Kisselle, Raisch & Choate, Detroit, Mich. (Chester L. Davis, Jr., and Robert A. Choate, Detroit, Mich., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (L. F. Parker, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

MARTIN, Judge.

This appeal is from a decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 1, 9, 10, 11, 12, 13, 14 and 15, the only remaining claims of appellant's application, serial No. 576,990, filed April 9, 1956 for a VALVE. The application relates to the construction of an air control valve of the spool type designed for "directing fluid to control apparatus such as cylinders and the like for machine tool operations and other industrial applications."

Claims 1 and 9 are representative and read:

"1. An air control valve comprising, a housing having a bore and spaced annular ports along said bore for pressure and exhaust connections to a source of supply and a work motor, a sleeve of relatively hard, wear-resistant material inserted in said bore having annular bosses thereon spaced to register with the annular portions of the housing between said ports, *said sleeve having a substantial clearance axially with said housing and also between its outer diameter and the inner diameter of the bore of said housing to provide a mechanical and thermal insulation space,* said annular bosses having grooves for receiving O-rings and O-rings in said grooves extending outwardly from said housing to seal the space between said sleeve and said housing bore and thus create composite ports between said sleeve and said housing, a valve spool having a lapped fit therewith, and passages formed in said sleeve wherein said spool may direct fluid between said ports, depending on the position of said valve spool.

"9. An air control valve comprising, a housing having a bore and spaced interior annular lands and ports along said bore for pressure and exhaust connections to a source of supply and a work motor, a sleeve of relatively hard, wear-resistant material inserted in said bore having annular bosses thereon spaced to register with the annular lands of the housing between said ports, *said sleeve having a substantial clearance between its outer diameter and the inner diameter of the bore of said housing to provide mechanical and thermal insulation space therebetween,* said annular bosses having grooves for receiving O-rings, and O-rings in said grooves extending radially outward from said sleeve into said space to contact the annular lands of the bore of the housing

and also to create composite ports between said sleeve and said housing; a valve spool having a lapped fit within said sleeve, passageways formed in said sleeve wherein said spool may direct fluid between said ports, depending on the position of the valve spool within the sleeve, means at each end of said bore positively positioned to confine said sleeve in said bore, *said sleeve being dimensioned axially smaller than the distance between said confining means, wherein said sleeve is in a floating position within said bore on all surfaces."* [Emphasis ours.]

Appellant's valve is best illustrated in an enlarged Fig. 2 of his application reproduced below:

PA 7092.

As shown in Fig. 2 the valve includes an axially movable spool comprising lands 84, 86 and 88 connected by restricted portions 90 and 92. The movable spool is reciprocally mounted in the inner bore 72 of a sleeve 71 which in turn is mounted in the main bore 50 of the main portion 40 of a valve housing. The spool is biased in one direction by a spring 94 and is movable in the other direction against the spring bias by a solenoid S. A fluid source, an exhaust passage, and opposed faces of a piston 100 in a power cylinder 98 communicate with the interior of sleeve 71 through various passageways in the housing and ports in the sleeve. The sleeve has both endwise and radial clearance with the bore of the housing and has spaced annular grooves in its outer surface, which grooves receive O-rings 76. The O-rings create a seal between the ports in the valve housing and the endwise clearance of the sleeve prevents it from receiving a binding pressure axially. This is said to insure a floating position in relation to the hous-

ing "in all directions controlled by the resilience of the interposed O-rings." By reciprocating or shifting the movable spool, selected passageways are interconnected to actuate the piston.

The clearance between the floating sleeve 71 and the valve housing 40 is said "to compensate for any warping or change in dimension of the housing." If the housing 40 becomes warped at all the clearance is said to prevent a disturbance of "the character of the bore 72 of the sleeve 71." Thus appellant considers it unnecessary to conform the coefficient of expansion of the main housing V with sleeve 71 and the movable spool. As a result "the main housings can be made of aluminum castings; and the sleeve and spool can be formed of high-grade steel reducing the weight and also the cost."

The references relied on by the examiner and the board are:

Moog            2,767,689 Oct. 13, 1956
Gerwig          2,781,782 Feb. 19, 1957
Berninger et al.[1] 2,791,237 May  7, 1957

The Moog patent discloses an electrohydraulic servo valve having a movable control spool reciprocally mounted in a tubular sleeve or bushing which, in turn, is mounted in a bore of a housing. It is stated in the patent that the bushing "comprises a tubular member preferably formed of steel and having an outer diameter slightly less than the inside diameter of [the] bore".

The patent to Gerwig relates to a valve which appellant concedes to be "of the same general type under consideration." Gerwig's valve sleeve contains a control spool mounted within a bore of a main housing. The sleeve is of less axial extent than the bore of the housing. A spring diaphragm in one end of the hous-

ing holds the sleeve against axial movement.

The examiner rejected claims 1 and 9 through 15 as unpatentable over Moog in view of Gerwig. It was his view that the Moog patent shows it to be old in the valve art to provide *diametrical* clearance between a valve sleeve and a bore to prevent binding of the sleeve valve. Since he considered that Gerwig showed a valve sleeve mounted within a valve casing bore, the sleeve being of less axial dimension than the bore to allow for "unrestricted thermal expansion of the parts", the examiner found no "invention" to apply Gerwig's end or axial clearance to Moog's valve.

In affirming the examiner's rejection, the board adopted the reasons of the examiner. It further stated:

"* * * Moog evidences a clear appreciation of the problem of binding in a valve arrangement of the general type with which we are here concerned, and * * * discloses a solution therefor embracing consideration of sufficient clearance between parts of the valve to prevent the binding, and this at temperatures expected in operation. Thus, it would appear that Moog represents a disclosure of the fundamentals of the basic concept here involved. While it may be that this reference affirmatively refers only to diametrical clearance for the sleeve, it stands to reason that the factor of binding prevention which is the subject of the patentee's appreciation would inherently involve aspects of end clearance for said sleeve as well. As to this aspect, Gerwig in an analogous organization clearly discloses such end clearance, of an amount as illustrated which reason-

---

[1]. The Berninger et al. patent was relied on by the Patent Office in connection with that feature of dependent claim 14 whereby a "solenoid is operably associated with said valve spool." Appellant in his brief did not consider the Berninger et al. patent in detail stating that "for pur-

poses of this appeal the patentability of claim 14 depends on the patentability of claim 9." Thus since claim 14 stands or falls with claim 9, we shall restrict ourselves to a consideration of the Moog and Gerwig patents.

ably would inherently permit longitudinal expansion and contraction effects under normal expected operation without the production of binding, and we agree with the Examiner that this would suggest as an obvious unpatentable matter the provision of end clearance for the sleeve in the Moog valve."

Appellant contends that the record is devoid of any teaching or suggestion that it would have been obvious at the time of appellant's invention to modify the valve disclosure in the Moog patent by providing the spring diaphragm of the Gerwig patent or, for that matter, any end clearance between the sleeve and the housing.

We think the issue is simply whether it would be obvious to a person having ordinary skill in the valve art with knowledge of the art of record to modify the Moog valve by providing within the bore of the main housing of the patentee's valve an axial or end clearance between the sleeve therein and the main housing. A careful analysis of the art convinces us that it would not be obvious.

Appellant states that, as a result of the provision of a diametrical clearance and an axial or end clearance, his sleeve is in a floating relation to his housing bore. It is this feature of a "floating" sleeve, due to the aforesaid diametrical and axial clearance, which avoids the adverse effects of warping or change in dimensions of the valve housing which otherwise causes binding or sticking of the valves. We think it clear that the Moog patent does not disclose any concept of a "floating" sleeve. This in effect has not been denied by the Patent Office since the solicitor concedes in his brief, as the board did by implication in its decision, that Moog does not disclose that there is any substantial end clearance between his valve housing and his sleeve.

The solicitor however refers to the statements in the Moog patent that the sleeve or bushing is formed of "an outer diameter slightly less than the inside diameter of the bore" and that "inasmuch as bushing * * * is mounted in O-rings in [the valve] body * * *, there is no binding thereof by the valve body to impair operation" of the spool at low temperatures. It is contended that Moog thus recognized the problem of valve spool binding due to distortion of the valve housing relative to the sleeve and proposed a slight clearance between these parts as a solution to this problem.

We do not consider that a teaching of a slight diametrical clearance in the Moog patent would suggest the concept of a "floating" sleeve, nor do we think that Gerwig would suggest modifying Moog to achieve a "floating" sleeve relationship. Although the examiner refers to Gerwig's sleeve being of less axial dimension than the bore to allow for "unrestrained thermal expansion of the parts", we find no such reference to "unrestrained thermal expansion of the parts" in the Gerwig patent.

Furthermore, although the drawings of Gerwig show the sleeve of less axial length than the bore in which it is disposed, one end of the sleeve contacts the housing and the other end is engaged by a spring diaphragm disposed between it and the housing. In his only description of that aspect of his construction, the patentee states that the "sleeve * * * is fitted within the chamber * * * and is *held against axial movement* between flange * * * and a spring diaphragm * * * bearing against cover * * *." (Emphasis ours.) It seems to us that that statement constitutes a teaching contrary to the provision of a construction permitting the sleeve to move in an axial direction, which feature is essential to appellant's floating sleeve concept. Certainly, it does not suggest that the sleeve in the Moog valve be provided with such end clearance between the sleeve and the housing as will result in a floating sleeve construction having the advantages disclosed.

For these reasons the decisions of the board is reversed.

**Reversed.**